Good morning, counsel. We're going to call the second case of the morning. This is appeal number 18-3351, David Igasaki v. the Illinois Department of Regulation. And Ms. Baumann, we'll begin with you. Thank you, Your Honor. And may it please the court, counsel. I would like to start out by reminding this court that, of course, the court will review this de novo. So the defendant's appellee's suggestion that this court should review whether the trial court was correct in making certain determinations is not correct. This is your honors looking at the record, looking at the record in the light most favorable to my client and considering the record on a whole, as a whole. And this is also relevant to their argument that there was some sort of waiver with respect to the documents supporting summary judgment. Again, it is up to this court to look at the documents to determine whether or not they are admissible, whether they are reliable, whether they are relevant. But only if you raise that issue with the district court. It's not up to the court to make arguments for either side. We're here to review what was done by the district court. And I looked very carefully through the record and didn't see anywhere before the district court that you objected to the admission of those documents on hearsay grounds. You said there were lies in them, but that doesn't signal to the court that you're objecting to them on the basis of hearsay. That's correct, but at this point you are considering the record de novo. And that's why I made the comment that I did, because I don't believe it's appropriate to... But you didn't raise it with the district court. So we do consider things de novo. We consider evidentiary issues for an abuse of discretion. But there's waiver as well. And if you don't raise something below, you can't raise it for the first time before us. So why haven't you waived your argument about the admissibility of those records? Because it is up to this court to review the record as a whole. It cannot ignore the law. If they put in a statement, some absurd statement, you know, I can't even think... You still have an obligation to consider the evidence, whether or not it was... Okay. Now, now, forgive me for interrupting, Ms. Bowman. That's a very important word you just used. Because Mr. Igusaki claims that the performance evaluations were unfair and didn't accurately reflect his work performance. But even if he could prove that, we need to know what evidence is there that the evaluations were a product of race, sex or age discrimination. As opposed, for instance, to, you know, a supervisor who did not like him. Where is the evidence? I've given this a lot of thought. I agree with this court's decision in Ortiz. But that decision has, in essence, seemed to confuse the matter a bit. Because while that is ultimately the question, really the issue of pretext and the issue of could a reasonable jury ever conclude are similar. And when we're looking at pretext arguments, we're looking at timing, we're looking at the history of employment, we're looking at how others are treated differently and so forth. So in this case, that's what we would look to. All right. Help us. Can you point to any admissible evidence in this record showing that the supervisor harbored animus based on his race, sexual orientation or age? The evidence there, I could not find anything directly related to those things. I could find evidence related to his disability. Didn't your client specifically admit during his deposition that he didn't know what discriminatory reasons his supervisor, Ms. Forrester, had? I believe he did. I believe that is what the testimony was. But again... From your own client. From your own client who's bringing this claim, claiming race discrimination, gender discrimination, and he admitted he did not know what discriminatory reasons Ms. Forrester had. How do you get around that, Ms. Baumann? That is often the case. And where you don't know which one it is, all you can say is I am being treated differently than my fellow employees. And it is up to the employer to indicate what, why, why they are in fact being treated differently than other employees. And here there's evidence that he was treated differently than, you know, non-Japanese American. You didn't identify any of those similarly situated individuals at the summary judgment stage, did you? I believe he, that the record indicates, not specifically, not with specific individuals, no. But he did testify that he was treated differently than his cohorts, meaning the other attorneys, the other staff attorneys with whom he worked. And there's also, there's no evidence that, and of course it was in his, those allegations are in his pleadings. And I don't think that anyone denied that his, that the other similarly situated employees were non-Japanese American or so forth. But you understand that a complaint is an evidence. You can't rely on allegations and a pleading as evidence at summary judgment. The, I believe the pleadings are accepted as... They are not evidence. A complaint is not evidence. Okay. So in terms of his disability, in terms of his arthritis, his gout in 2011, he had a severe attack of gout in the office and his coworkers wheeled him apparently into a meeting. And he was disciplined by... Hold on a minute. Wasn't he told by his supervisor at that time that if he required an accommodation, he could request one, but he didn't request one. He waited until January, 2015, and he was granted a special keyboard. He was granted a dictation device for notes. It's true that he wasn't given an extension of deadlines, but the medical note in support of his accommodation didn't indicate that extended time was necessary. So where did he provide evidence that the accommodations that were granted weren't reasonable? Well, actually he, I believe the evidence is that in December, December 14th, 2015 is when he, or mid-December was when he first complained about that arthritis in the gout in his wrist. So it wasn't January and his testimony was... He may have complained, but it was... Right. And I'm sorry to interrupt you, Ms. Baumann, but it was January 26th of 2015 that he specifically requested the accommodation. So just complaining alone isn't enough. But the request for an accommodation was made in January of 2015, and Judge Rovner's question was why weren't the accommodations, which they did make, sufficient? What evidence is there that those accommodations that were made for your client were not sufficient? That gets into the issue of the process that the Act requires, which is that the employer, the employee, and the doctor communicate with one another if there are issues, if there are questions. The employee and the doctor? I don't understand. Employer, the employer has an obligation to engage in an interactive process with the employee and with the doctor if there are any medical questions about what is required. What law says that the employer has to communicate with the doctor? Where there would be all sorts of HIPAA issues, among other things. Of course, when you fill out a request for accommodation, you are waiving, usually in my experience, you're waiving your HIPAA rights and you are permitting your doctor to fill out forms and talk to the employer. I'm not suggesting that HIPAA should be overlooked by any means. What case do you have that says that an employer has to have an interactive process with a doctor once an employee asks for a reasonable accommodation? I'm not aware of any such case. I am not aware of any such case. By extrapolation, I believe the interactive process requires that if there are any questions whatsoever, that those need to be resolved. Whether it be through discussion between the employer and the employee or between the employer and the doctor. Whether the employee needs to go back and get additional information from the doctor himself. You know, that's what the interactive process is. Ms. Baumann, you're into your rebuttal time. Would you like to reserve the remainder? I would. Thank you. Thank you. Ms. Chenever will move to you on behalf of the appellee. Good morning, your honors, and may it please the court. I am Assistant Attorney General Caitlin Chenever and I represent the Illinois Department of Financial and Professional Regulation. After receiving negative performance evaluations for three years and being placed on a corrective action plan that had to be renewed numerous times, the department discharged Mr. Igasaki from his employment with it. It was Mr. Igasaki's poor performance over several years that led to his discharge and not any discriminatory reason as he claims. Were his performance evaluations consistently positive before Ms. Forrester? And if so, would that be some evidence in your view that the negative evaluations were not based on his performance, but rather on some other motive? Mr. Igasaki testified that he received positive performance evaluations prior to the 2012 evaluation when his supervisor Forrester reviewed him for the first time alone. However, that wouldn't be relevant here because this court has explained that prior positive performance evaluations are not relevant. The relevant inquiry is looking at the performance evaluations that were more recent and occurring at or near the time of the adverse employment action. And here for three years leading up to his ultimate discharge with the department, Mr. Igasaki consistently received poor performance evaluations and again had to be placed on a corrective action plan that was renewed several times over the course of two years. As to Mr. Igasaki's discrimination claims based on race, age, excuse me, race, age, and his sexual orientation. Those claims all fail under either the McDonnell Douglas framework or under the totality of the evidence framework. As this court has already pointed out, at summary judgment, Mr. Igasaki presented no evidence of a similarly situated individual outside of his protected class who was treated more favorably than he was. Was it clear at the district court which of those theories he was pursuing? Was it clear if he was pursuing a McDonnell Douglas or an Ortiz or both? As I recall, Your Honor, I believe it may have been both. It wasn't specifically clear. But under either theory, under either theory, his claim must fail at summary judgment. Again, under the McDonnell Douglas framework, there's no evidence of a similarly situated individual outside of his protected class who was treated more favorably than he was. The similarly situated individual must be someone directly comparable in all material respects, and this includes an individual who shares the alleged shortcomings with the plaintiffs. And at summary judgment, Mr. Igasaki presented no evidence of another staff attorney in the office who was similarly struggling with performance issues or work deadlines or anything like that, and then who was being treated more favorably than he was. Even under the totality of the evidence standard, Mr. Igasaki's claim failed. Again, there were several years of poor performance evaluations, a corrective action plan needing to be renewed several times because he was not making sufficient improvement, documented instances where Mr. Igasaki delayed in processing cases, having documents rejected by medical disciplinary board members, being told, Mr. Igasaki admitted that he was told repeatedly to clean and organize his office. And Mr. Igasaki also admitted that he missed some deadlines, even though the corrective action plan required him to meet all deadlines, or if he could not, to request an extension of the deadline within a reasonable amount of time. So under either theory, either the McDonnell-Douglas framework or the totality of the evidence, excuse me, the totality of the evidence standard, Mr. Igasaki's claim failed and the district court properly entered summary judgment. I would also note that there was no evidence that Mr. Igasaki was terminated in retaliation for requesting any kind of accommodation or filing a charge with the EEOC. He first requested an accommodation in January of 2015, and that same month, he also filed a charge with the EEOC of discrimination. He was not ultimately terminated with the department until nearly two months later. And this court has held that suspicious timing alone is often not sufficient to establish the causation element for retaliation. And here, there was, again, over two months, which weighs heavily against inferring any kind of retaliatory motive for the termination. And again, the totality of the evidence shows that Mr. Igasaki was terminated because of his repeated poor performance evaluation stretching over several years. What impact should the fact that Ms. Forrester removed him from the CAP plan shortly after he filed his EEOC complaint have? Even if Mr. Igasaki was removed from his corrective action plan in January of 2000, or it was not continued into 2015, Mr. Igasaki testified that Forrester nonetheless had told him that he was generally not meeting her expectations. And so there's no evidence that his performance started to improve in January 2015, or that all of the problems that he had been having with managing his caseload, proceeding with cases, cleaning and organizing the office, those sorts of things. There's no evidence that all of those had been solved, and he was now some exemplary employee. And lastly, as to Mr. Igasaki's claim under the ADA, as was pointed out, after he requested an accommodation request, made an accommodation request in January 2015, the department responded, granting in part his request for an accommodation, providing him with three accommodations, an ergonomic keyboard, a tape recorder, as well as offering him access to an administrative assistant to help him type his notes. The accommodation request specifically noted that if Mr. Igasaki could accept, reject, or appeal that accommodation within 10 days. And so to the extent that Mr. Igasaki argues that the department failed to engage in any kind of interactive process, again, the accommodation was provided and it was specified that he might, if he would like to, he could accept, reject, or appeal that decision. There's no evidence in the record that he responded at all to the department's accommodation that was given to him, nor was there any evidence in the record that the accommodation that was given to him wouldn't be sufficient to accommodate his gout. Unless the court has any other questions, we would ask that this court affirm the district court's grant of summary judgment to the department. Thank you. Thank you, Ms. Chenevert. Ms. Baumann, we'll return to you for rebuttal. Thank you. I think the justice hit on one of the most important points here, and that is that he was taken off of the corrective action plan. They had a meeting on the 27th. He was not told that he would be subject to further discipline. He was not told at that time that he would be terminated. In fact, he was told that in various areas he had improved. I think looking at the record in the light most favorable, he could assume that he was taken off because he had improved. I think he and we assert that his request for accommodation, his filing with the EEOC was sort of the last straw for the employer in this case. And as this court knows, if that is a reason for the termination, despite his alleged problems, even if we assume he had these workplace problems, and he denies most of them, he denies the accuracy of most of them. But even so, he was taken off. He was proceeding. There's no indication from the record that there was further discipline, there was further anything. And the next thing he knows, he is terminated. And if your honors look to 8116, you will see that even though in writing he did make that accommodation request, as we've said, he did indicate that he was having this disability. He asked for forms, and he apparently was not given the appropriate accommodation forms. And when he was, he filled those out. Thank you, Ms. Baumann. Thank you, Ms. Chenevert. The case will be taken under advisement. We're going to take a brief recess for about 10 minutes.